Case number 16-3149. NRA Ohio Execution Protocol Litigation. Angela Fears et al. v. John Kasich et al. Argument not to exceed 30 minutes per side. Ms. Barnhart, you may proceed to the appellant. May it please the Court. I am Erin Gallagher Barnhart. I represent several appellants directly and I am presenting argument here today on behalf of all the appellants in this interlocutory appeal. I've reserved seven minutes for rebuttal. Before beginning my argument, I would like to briefly summarize two very recent developments in the District Court that we believe are relevant to this Court's consideration in deciding this appeal. First, defendants plan to execute plaintiffs Phillips, Tibbetts, and Odie beginning in January under a new protocol. This new protocol contains the same two methods as the last protocol that are protected under the protective order at issue in this appeal. But it adds in a third new method that's new to Ohio. This new method uses three drugs, midazolam, a paralytic, and potassium chloride. And the state has obtained the drugs it needs for this method. That's the one that was approved by the Supreme Court. Are you referring to Glossop, Your Honor? It is the same three drugs that were at issue in the Glossop decision. The second development in the District Court is that these three plaintiffs only are litigating motions for preliminary injunction and stays at execution. And there's been ongoing discovery disputes. We indicated in a letter filing earlier this week some of the District Court record documents that we think could be relevant to this decision. These include that defendants have moved for a protective order concerning their acquisition of the drugs for the new method in the new protocol. And they've argued that this current protective order covers those drugs, even though that method was not in the protocol at the time the District Court entered the protective order. So now, as far as these proceedings, we are asking this court to hold that the District Court abuses discretion in granting the protective order that allows the appellees to withhold relevant information that's key to several of our claims. We believe the District Court erred for two reasons. First, the appellees did not meet their burden under Rule 26 to present specific evidence of a particular harm that would justify the protective order. And second, all of the appellees' legitimate interests would be protected with an order providing for restricted, attorney's-eyes-only disclosure of the information that still avoids public disclosure of it. What effect does the decision in the Phillips case have upon this? Well, I don't think the decision in the Phillips case has a great deal of effect on this case. As you know, most of the merits were not reached because it was decided on standing. Do they have standing in Phillips? Do they have standing here? They absolutely have standing here. I don't know whether there are litigants in the case that are seeking discovery and this protective order was entered to block that discovery. So I don't – I'm not aware of what standing concerns there might be. Okay. So the District Court justified its protective order on three grounds. The first were safety and security threats to the compounders that could be a risk if their identities were disclosed publicly. The second was to prevent the drug source defendants from being subject to litigation in the suit. And the third ground was that the state would be unable to carry out executions if they couldn't obtain the drugs. So I would like to begin by discussing the type of specific evidence that's being withheld and why the appellants need it, because I think that's something in the Phillips argument that, you know, was a little more abstract. But here in the context of concrete claims, it's easy to see that we're talking about much more than the actual name of the supplier. So there's several categories. I'll start with a couple examples. First, some of the evidence that we need to prove our claims has to do with how the drugs are stored and handled throughout their supply chain. So, for example, the drugs that are used in the three-drug method, one drug has to be refrigerated. The other one can't be refrigerated. And if these drugs are transported together and stored together, that's a problem, an Eighth Amendment problem, because it can change the quality of the drugs. And this is kind of more relevant now than it was before, because before the protective order, we routinely received this kind of information, lot numbers, all kinds of information about where the drugs pass through from the source. And what you've received on the new protocol is just the names, is that correct? The names of the drugs, correct. We don't know anything about where the drugs are coming from. We do know, for instance, again, talking about the drugs in the new protocol, the defendants have represented that these are manufactured, not compounded drugs, by an SDA-approved manufacturer. Well, every SDA-approved manufacturer has restricted the use of their products in executions, because they don't want their drugs being used to kill people. Well, that means, then, that the defendants can't be getting these drugs directly from the manufacturer. They wouldn't sell it to them. And different manufacturers have different ways of going about it, but when they sell it, they might have a restricted end-use contract prohibiting sale and so on. So we don't know whose and how many hands these drugs have passed through to get to the state. And, of course, these are more irregular channels than stuff that's bought in the open marketplace in public. Is it your business to find out if there's a breach of contract between the manufacturer and some intervening party? Well, the way that that becomes relevant is in our civil corruption claims. They're brought under Ohio's version of the federal RICO statute. One of the predicate acts in... Kind of a stretch to put that in this case, is it not? I don't believe so, Your Honor. What case is the Massachusetts case? The New England Compounding Pharmacy. So that was a federal prosecution, as opposed to a private right of action being brought. But, yes, I think that gives a good analog of the type of violations that are being prosecuted in that case can form the predicate acts for the claims in our case. What's your best case to show it? It's authorized under the laws of the U.S. or local laws for civil matters. That a claim under the... What's your best case to show it is a good case that you have on this RICO procedure? Yeah, so to be clear, we are using the Ohio Civil Corrupt Practices Act, which is actually broader than the federal RICO. It's a state procedure. I'm sorry? It's a state procedure under Ohio law. It is. So there would be supplemental jurisdiction over those claims in federal court. So does that sufficiently answer your question? Do you have a good Ohio case on this? I haven't looked up... I mean, I can provide some examples of Ohio cases using... I mean, it's sort of... It's nice if we're not getting out in areas where there's never been any precedent. Of course, first case in every law, of course. But it's nice to have a case on your... Yeah, I mean, to my knowledge, this is a new sort of use of the corrupt practices laws. But as far as the authorization to do so, it's abundantly clear that private right of actions are provided for in those laws. And as I was mentioning, Ohio's is extremely broad. When it was enacted, there were statements by its sponsor, I believe, talking about how this is extremely robust, much more robust even than the federal RICO. The issue that you raised also had to do with whether these drugs may be tainted for the constitutional claim of cruel and unusual punishment. Absolutely. So that's kind of another category of information that we need. Some of that might come out if we find that it was improperly stored or handled. But also, particularly when we're talking about compounded drugs, making sterile injectable drugs like the ones at issue here is a very sophisticated technical process. And there are many steps along the way where things can go wrong. There's really stringent standards for sterility, for refrigeration, for all kinds of things like that. And the only information that we now can have about a compounder is simply that they're licensed by the state. And that alone doesn't tell us anything about the kind of violations that we saw in the Oklahoma pharmacy, the apothecary shop that's referenced in our brief that had close to 2,000 violations dealing with contamination, sterility problems. And these are not minor kicky tack things. These are people weren't wearing gloves or goggles. Instead of walking to the refrigeration unit where they needed to store these drugs at a specific temperature, they had just a personal igloo cooler at the side of their desk where they were keeping them. Did you say all three of these drugs are compounded or not compounded? So the current protocol has three methods in it. Compounded or not compounded? The two that are the same as the last protocol that this protective order issued from can be compounded. That's the pentobarbital and the thiopentosodium. Can be, but not necessarily? Well, the defendants have represented that they can't purchase those drugs FDA manufactured. And so in reality, it would have to be compounded. Now, the third drug, as I said, the midazolam and the paralytic and the potassium chloride, they've represented are FDA manufactured. But as I said, that's the extent of what we know about that. I'm interested in your second component, the component that the protective order had to be issued because otherwise there would be suits involved, disclosure of these defendants' identities would subject them to lawsuits. How is it that you understand that basis for the protective order? So Judge Frost made that clear in the order he issued in response to our motion to modify the protective order. And he specifically said that one of the harms that the order is designed to protect against is that the drug source defendants would be subject to suit. So is there a concern that that isn't a sufficient basis? I'm trying to understand exactly. There are a variety of claims that could be brought as a result of this secrecy statute. So this is the defendants are protecting themselves or the defendants are protecting the drug manufacturers in this analysis. The second, Your Honor. The drug source defendants have not appeared in this lawsuit. Certainly. And so the... Even though you have a potential... That's correct. ...name defender. Right. And that's actually the only reason that we truly need to know their identity. Like the name of the drug source defendant is needed so we can serve process on them and sue them. And there's just one type of claim, that's our civil corruption practices claims, that requires that information. Okay. So what is... So walk me all the way through then how you understand the connector of that to the denial or the grant of a protective order to the state defendants on the basis that their drug suppliers may be subject to suit. So the connection that the district court made... The connection upon which the district court is relying... Right. ...in that particular case. So, you know, the court isn't explicit about that, and part of that might be because of the way that the defendants framed their motion for a protective order. As you know, they're required to identify specific harms with particularity. And in this case, the defendants, I have it quoted here, said that the harm was that exposing the identities of the drug source defendants, quote, will expose them to potential harm, oppression, annoyance, or harassment. So that's what they've specifically alleged in the portion of their motion that has to deal with a protective order. What does Rule 26C say? What does the rule say? What does the protective order rule require a defendant to prove about itself in order to obtain a protective order? If I'm following you, this gets into the particular and specific demonstration of the kind of harms that will result. And on that point, I think that the recent Eighth Circuit case that has gone through a couple iterations, both parties have supplemented through 28J letters this court with information about that case. I think that perfectly illustrates why the evidence presented here is insufficient. So in that case, basically the defendant side lost twice, and then they won on the third go-around. So the first- The only thing left in that case, the district court decision, because the Eighth Circuit set it aside, or I'm thinking about a different case. So the district court entered a discovery order, and the defendants moved to quash and lost. Then they filed a mandamus action in the Eighth Circuit. And the Eighth Circuit upheld it and then withdrew that. It then vacated it. This is going on a district court order, right? I believe that by vacating, I guess I'm not entirely positive, but my understanding was that they then gave the relief that the defendants were seeking, and so they have blocked the discovery. And they only blocked that discovery after the anonymous drug supplier intervened and proceeded under a pseudonym and then presented a declaration that specifically said the harm that was just speculative before would come about, that if their identity was revealed, they wouldn't produce the execution drug. And that's what I'm trying to understand here. You do not have a drug manufacturer as a named defendant in this case. Correct. So Rule 26 says that you may protect a party, and there is none in this case from the manufacturer, or a person from annoyance, embarrassment, oppression, or undue burden or expense. And then it says what you can do. What is it in this lawsuit that the defendant must prove, I presume about itself, since there is no drug manufacturer in this litigation yet, that would enable the proof necessary to obtain a protective order? So I... Or what do you think they thought they proved? I think they thought or that they argued that they would not be able to carry out executions if drugs were unavailable, and the drugs would be unavailable if the drug source suppliers wouldn't produce them because they were fearful or because they didn't want to be subject to suit. But as your question identifies, there is zero evidence to prove that. And that's the difference between this case and the Eighth Circuit case, is even when the defendants in the Eighth Circuit offered declarations, which is more right off the bat than the defendants did here, offered declarations saying in sort of general terms that, well, if it's revealed, we won't be able to carry out executions. The Eighth Circuit rejected that because it was speculative. It wasn't specific. And as it turned out, they were right to be suspicious because when the drug source supplier finally did intervene and enter their own declaration, it became clear that as the Eighth Circuit suspected, the department hadn't talked to the drug supplier. They hadn't said that they wouldn't provide it. They were just speculating. And that's not enough under the federal rules to justify relief. And I would submit particularly in this case where some of the relief that has been granted by the district court and upheld by this court was on the basis of things that the defendants weren't doing what they said they would do. So they said, trust us. We're following the protocol. We'll do this. And time and time again, they didn't. And so particularly here, there's precedent that it's not enough to accept the defendants saying, it's fine, believe us. And it goes beyond simply, you know, whether they've introduced, you know, that evidence. Like, for instance, there's three now, three methods in their protocol. There were two before. Even if the defendants had offered evidence from a single supplier, because of the discovery block, we have no idea how many suppliers they talked to. Whether the reason suppliers don't want to supply drugs is simply because the defendants haven't offered to pay enough for them or because they're not going to do it at any cost because it violates their morals, the ethical rules of their profession. There's a lot of reasons why a supplier might not be supplying drugs. And the defendants haven't offered the evidence to show that it is the reason that they've argued. And it's your understanding that the defendants are claiming that this new drug protocol is protected by the protective order. What about the gap period before they issued the new drug protocol when they were exploring or talking to people? That litigation about that is pending right now before Judge Meurs in the district court. And we've designated those on the record designation. In response, so what Judge Frost's order said in a footnote was, presumptively this protective order would apply if they changed their protocol. But he made very clear that it's not going to... Again, they changed. Exactly, exactly. He said he wasn't going to give them carte blanche to do whatever they want. He's balancing the need for the plaintiffs to know what the defendants are doing, even if they can't get the specific information, to just know what's going on with that. And so he made crystal clear the moment they pursue drugs that are outside the protocol, they're acting outside of the protection. And so we don't believe that the protocol... I'm sorry, that the current protective order should block information about these new drugs, but the defendants are using it for that right now. And so we're waiting to see how that litigation turns out in the district court because... How does all that affect the timing of the litigation? It affects it greatly. I mean, we're less than two months away from Phillip's execution, and this is... Do you have any motion for stay of execution? We do. The three plaintiffs have filed preliminary injunction and TRO stay motion, but we haven't even started discovery. And the defendants took the position that while this intellectual appeal is pending and the district court proceedings were stayed, that they were not under obligations to supplement their discovery. And so they've provided a handful of protections, but they have simply stated that they've withheld so far 70 pages of documents. That's it. They haven't provided a privilege log. We don't know if there's other things that might be relevant that they're not including in that. Do you know whether they were the type of information that was previously provided about the drug protocol itself? So the protocol is publicly filed. So that's available. But the type of information that was previously provided about... The lot numbers and... Exactly. And it's more than just the drugs. This protective order is so broad it covers execution team members. And previously, I think I have an example of that here, the district court ruled that, for instance, there was a team member who was undergoing a health condition. And because of treatment and medications and other things, the district court ruled that could be relevant to his ability to fulfill his role under the protocol and conform to it, and we deserve discovery on that. Well, the defendants haven't provided any update to that initial disclosure about the team member either. And so it's not just about the drugs. It's about so many entities and people that are involved in the execution process. That's all part of this appeal, or is that what's pending down in the district court? Well, that's part of this appeal because it goes to the scope of the protective order itself. And I guess, you know, in the district court, there's kind of two actions. One, we're saying you owe us this discovery even under the current protective order. Then second, we're saying you owe us, so that's kind of ongoing discovery that we requested long ago and routinely had been given but we haven't gotten in about a year. Then we're also saying we need discovery about the new drugs that you have recently acquired. And they're refusing to provide that as well. One, pointing to the current protective order, and then alternatively moving for a new protective order to cover that if the current protective order doesn't. If I could, I guess, talk a little bit more about some of the other information. One thing I want to point out as well, and I'm just going to be very careful because it involves pleadings that have been filed under seal in the district court, and we've noted those on our designation. So I'm not going to speak to the substance of that, but claims raised in those sealed supplements to the complaints also involve evidence that is prohibited from being disclosed under the protective order. And we would be happy to file a brief letter brief laying that out in more detail if the court wishes. I just obviously can't speak about it in open court, what those claims are that are being raised, but there's evidence that would be directly relevant to that that is blocked by the protective order as well. So that's another example of things that we can't get. And then the other category that has been very important in the past, for instance in the Smith and the Lorraine cases, are documents that are generated during an execution. Now those don't exist yet because there hasn't been an execution, and so we don't know, but the defendants have not assured anybody that you're going to get all of that stuff that you got before, and it certainly falls within the scope of the protective order that that type of stuff that was absolutely essential to granting relief in the past is going to be withheld as well. I believe your time is up. You have your reserved time completed. Jane, can anybody hear me? Yeah. Do you have further questions, Judge Norris? I'm sorry. No, I haven't been able to participate in the whole thing. I've tried to ask questions and just, you know, obviously she hasn't been able to hear me. Is there a way that can be fenced for the next? We have not been able to hear you. And Judge Norris, I apologize. I saw you talk to someone in the room. I thought we were trying to get word to Jim because I thought maybe you muted your line until you had a question, and I couldn't tell whether you were trying to ask a question or you were just talking to the other person in your room. So we can hear you now. I'm not sure. We can hear you. Oh, wait a minute. You did go out again, it looks like. Go ahead and say something, Judge Norris. I did try to ask questions, yeah, and obviously it didn't work. Yeah. And I gave up. So now would you like to add? I've even forgotten my question, Jane. Just so there's a way that I can do this and interrupt the state, that would be fine with me. And when the plaintiff returns, if you would like to add any of your other questions, we will extend the time as needed. Dixie, if you would be sure to watch the monitor and interrupt us. If you see Judge Norris trying to speak, I would appreciate it. Okay. I apologize. I can raise my hand if that helps. Whatever works for you will work for us. Judge, if you could do that, that would help, actually, because, as I said, I saw you a couple times talking, but I thought maybe you'd muted your line on purpose. I'll raise my hand. Okay. We will come into the video age at some point, but it is not easy. May it please the court, Assistant Attorney General Charles Elwood representing state defendants. Your Honors, as counsel indicated, the question before this court is whether the district court abused its discretion in issuing a protective order which essentially keeps, from disclosure and discovery, information which would lead to the identities of the sources of Ohio's execution drugs. In Glossa... Judge Norris has a question. Yes. Counsel, what is your view of the effect of our decision in the Phillips case on this particular motion? It buttresses it, Your Honor. In the Phillips case, the court essentially, as part of the court's essential holding, was that the prisoners' interest in developing their claims really was not materially affected. The prisoners, they had the opportunity to litigate their claims, and as a result, that's a very important consideration in terms of balancing the interests here. In Glossa versus Gross, the Supreme Court of the United States recently affirmed that capital punishment is consistent generally with the Eighth Amendment. The court also... Yes, sir. I think he would be arguing that in the Phillips case, we said that the state has the ability to block these plaintiffs from getting the information they're seeking in this discovery order. Yes, sir. Well, give me your best argument. The argument is this. The state's interest here can be really seen in one incontrovertible fact. As the Supreme Court recognized, the availability of execution drugs is an obstacle which has significantly impacted the state's sovereign ability to carry out its criminal judgments. I thought that there was a good bit of case law that spoke about the availability to a state to create its own lab, make its own drugs. Why does there have to be discovery that hides people who choose to sell it to the state when the state has its own avenue of supplying and creating the drugs itself? Your Honor, numerous courts have recognized that the threat of public disclosure to the sources of the state's execution drugs prevents those states from obtaining the drugs. From obtaining the drugs from a manufacturer, but how does that have anything to do with their ability if they're not satisfied with the availability in the open marketplace? How does that have anything to do with their ability to manufacture their own drugs? Your Honor, I suppose that's theoretically possible, but as far as I know, no state has ever resorted to that particular alternative, and no court has ever held, nor the Supreme Court has held, that the state is required to take such extraordinary efforts, particularly... There were years in which drug manufacturers were willing to manufacture these drugs and sell them for the purposes of execution, but as a result of either changing standards of human thought in our nation, or as a result of the pressure of making public what the drug manufacturers are selling, those individuals and those companies have chosen to no longer supply those drugs. In that context, I'm at a loss to understand how what you're saying the protective order can do is to say, even though you could make your own drugs, because public opinion now suggests that manufacturers no longer want to sell them to you, or we can enter a protective order that will say, you don't have to make your own drugs, we will hide the names of the drug manufacturers, even though those manufacturers have said that they don't want to sell their drugs for execution. Your Honor, may I say this, that virtually every conceivable argument has been advanced against the state's execution methods and the drugs that have been used in the past. I can imagine, and it would be very foreseeable, that if the state engaged in the extraordinary process of manufacturing or producing its own execution drugs, that would generate an incredible amount of litigation and time and complaint. That in itself, a deterrent. Here, Your Honor, I must go back, this is not a new question. This question has been faced by many, many courts, and those courts have virtually universally balanced the interests in favor of the state. Those courts recognize, as the Supreme Court of the United States recognized, that the states have a legitimate interest in carrying out capital punishment, and through obstacles, and that's a word that the Supreme Court of the United States used, obstacle, beyond the state's control, the states have been impeded in carrying out that interest, and the state's interest outweighs the interest in prisoners who challenge the state's method of execution. Well, the petitioner here suggested that the states standing in for these drug manufacturers, and they ought to proceed as they did in the recent Eighth Circuit case, by having a drug manufacturer file its own affidavit saying that they're afraid and they won't produce it if they're revealed and all that sort of thing. Why can't that be done? Your Honor, this is a Catch-22 situation which the district court addressed. The state's paramount interest here is getting the drugs. The state can't do that if the sources will not cooperate. Now, suppose that the state said, oh, we need someone to testify, to come into court to testify, that, oh, yes, I'm afraid. There has been testimony offered behind a screen, has there not? That has been with respect to execution team members. But in cases like this, in execution cases, confidentiality has been protected by testimony behind a screen. I would submit, Your Honor, there's a difference between a person who is a member of the execution team and or who has volunteered to participate in this very, very difficult task as opposed to a commercial, a business person who's concerned about his reputation, his business. The idea being, Your Honor, is by asking the person if they would be willing to testify, the result could very well be there's a lawsuit, I've got to testify, no way, I'm cooperating. And that recent case is a very good example. Now, counsel said, look, this is a case where they received protection because the manufacturer intervened in the case and said they needed the protection. Well, if you look at that case very carefully, that was a mandamus case. And the panel initially said that due to the high burden of mandamus, that more was needed. Now, they also noted that the state in that case didn't ask for a protective order initially. So by the time it got on appeal, you were looking at a mandamus standard, which was much higher. Now, it is true that the manufacturer did come in, intervene anonymously, and did say that. But the question is, do you think the state, what was the reason for that? Why would the state do that? Well, I would submit the state was reluctant to go to that person, that manufacturer or that supplier, and alert that source because that in and of itself could have resulted. Yes, sir. Counsel, if I could ask a question. What is the state's position should these plaintiffs wish to test the cocktail that's going to be used in their own execution for purity, whatever? The state's written execution protocol specifically provides for testing, mandatory testing for compounded execution drugs for identity and potency. And it allows for testing for manufactured drugs. By the plaintiffs? Your Honor, I would, of course, the written directive provides for the state doing the testing. But that's a matter, Your Honor, that the protective order doesn't address. And conceivably, that could be, that is not eliminated. That possibility is not eliminated by the protective order. In this case, some drugs were actually tested. The possibility, I'm sorry, let me understand your argument. The possibility of the plaintiffs testing these drugs has not been eliminated by the protective order. This protective, what this protective order does is that it protects information which could lead to the identification of the sources of the drugs. Now, what that information is, that's a question for the district court in applying the protective order. Here, the question presented here really comes down to this. Is there going to be an order to apply? Because if there's no protective order, then there's nothing for the district court to apply. The district court still retains the discretion to utilize that order and to make appropriate orders and keep it within limited scope. In this case, I have to say this. In this case, it's a fact that it's been over nearly three years since Ohio has conducted an execution, principally because of the difficulties of getting execution drugs. In this case, so much information has been provided as to how drugs are administered. In 2009, in this case. The question is, what happens going forward? We understand that there was a great deal of information provided in the past, but the position that the state takes now and may take under the protective order is that that information is no longer going to be supplied. And the question before us is, did the protective order, was it properly issued? Was it an abuse of discretion? And that's why we're talking about the other circuit cases and district cases. And, you know, I'm looking at the district court's order itself where it says, it's found your assertions of burdens or prejudice to be largely speculative or conclusory, if not outright hyperbolic. And did that based on your experts extrapolating the risks by looking at, by surfing the Internet about abortion and animal rights and the morning after pill and in light of his testimony that he was unaware of any known threat in Ohio to implementing the death penalty. So the question that's before us, does that meet the requirements of Rule 26C and the burden that is on you to provide particular and specific evidence that is supportive of the burden that you bear in this litigation? I'll say three things, Your Honor. First, the district court also noted other evidence presented by the state, and the district court did note an incident where a compounding pharmacist received an email which essentially implied, or even more so than that, that he had better be prepared because anybody can go out and get a truckload of fertilizer. Was that from this district court? Was it before the district court? This was an exhibit that was presented. This was an email which the state defendants presented and was considered by the district court. From another state, correct? Was it the Oklahoma email? Yes. It was not sent to anybody in Ohio, is that correct? That's correct. But, Your Honor, the second thing is this. Has the district court recognized? Again, if we go back and we look at what was the evidence presented in other proceedings, what the district court recognized here was the state's primary interest is people getting execution drugs from sources that may feel threatened, may feel intimidated, may not cooperate. And that is something that the state, so in other words, when we were talking about what evidence is necessary to show that the state's interest is being harmed, well, this is not a case where the state is protecting a witness and wants particular security for someone. This is a case where the state's primary interest is derivative or affected by what other people perceive. And again, I would note that the availability of execution drugs has been an obstacle, and that obstacle has in part been because drug sources do not wish to help the state because they fear their exposure. Yes, they fear. I guess my problem is I'm trying to understand what is your evidence that is not speculative that shows in your situation they fear it, because you conclude they fear it. Your opponents may conclude that they have just decided that that's an improper use of a product that they create, and they do not want to be involved in the execution of human beings. Why is that not, back up, it's your burden to prove it, so why do we have to assume your assumption without hard evidence in Ohio that it's because they would sell it to you but they're afraid versus your opponent's argument that no, they don't want to sell it to you because they want to be out of the death business? Your Honor, again, the most compelling circumstance here is the fact, the incontrovertible fact, that Ohio's executions have been delayed for almost three years because of the inability to get executed. Before the court, the district court, did the district court know that? Oh yes, yes, it's a matter of record, Your Honor, that here the situation, when the state was confronted with this situation, the state determined that it was going to be necessary, unfortunately, to delay executions because of this problem. The state recognized that right away. I want to say this as well, Your Honors, that this is something that the state has always been, if you will, up front on and informative to the district court. Going back to 2010, when this problem first surfaced, the state was very up front with Judge Frost saying that this could be a problem. As a matter of fact, one of the reasons, one of the things that was done in this case was the state agreed to give prisoners 30 days notice, at least, when the state changed its execution protocol to allow for them to have notice as to what, if the state changed the drugs, what those drugs would be. Your opponents claim that some of these executions were botched, to use their words. How does that fit into it? Your Honor, I would say this. First, of course, the matter before the court now is not Ohio's conduct of executions, but rather the rather limited issue of the protective order. Secondly, I can only point to one of the most recent decisions of Judge Frost, where after a very thorough evidentiary hearing and a preliminary injunction motion, he essentially said that the state's safeguards that they had put in place had been remarkable, and the state has conformed very well with its execution procedures. Was that before or after the execution of Dennis McGuire? That was before. And does the difficulty, the admitted and public difficulty of that execution not change the facts that are before this case? Your Honor, there has been no hearing. There's been no judicial proceeding on that execution. It is a matter of debate as to what happened in that execution. The one thing we can say is not a matter of debate, and that is the care with which Ohio and Ohio's execution personnel, the Department of Rehabilitation and Correction has taken in these cases. As a matter of fact, Your Honor. I don't think anybody says that Ohio is trying to do botched executions. No one thinks that that's their desire. The question that's before this court is what is this drug protocol, what information may these plaintiffs have about this drug protocol, and is it necessary because it entails difficulties that we see in the executions that have occurred of late. Perhaps we could move on. I'm also concerned about this risk of litigation that we had discussed with your opposing counsel. And I would like your take on what is the risk of litigation that underlay the decision to grant this protective order. The district court properly recognized that one of the concerns that potential execution sources have is that they will be sued, that they will be embroiled in litigation. Now from the state's, again, that's what I was talking about before, Your Honor. The state's interest is derivative. The reason why that matters to the state is not the state wants to make sure people don't get sued. What matters to the state is the fear of suit by those sources will prevent them from assisting the state with carrying out executions. And so that is a real threat. One of the cases that we cited in our brief in which it was held that the identities could be protected, cited that very fact. They said the minute the source found out he was going to be named as a defendant in the lawsuit, that was it. He said, I'm not doing this. I'm not going to get involved. So help me understand. We all agree that state privileges are not federal privileges, correct? I think you raised no objection to that in the briefing. Yes, we understand that, Your Honor. So what I'm concerned about is the way this state privilege is used as a basis for granting a federal Rule 26 protective order. If a state privilege is available to foreclose information in this way, isn't the federal government then functionally granting to any state privilege law the ability to foreclose discovery in the different litigation before a federal sovereign? Your Honor, I'd like to make clear that Judge Frost did not adopt Ohio's recent statute as a privilege which he applied. He explicitly did not do that. But what he did do reasonably was he understood the considerations which led to the passage of that statute. And he considered those facts, if you will, those you might say legislative concerns, in determining that a protective order here was necessary to protect the state's interests. Doesn't his second order clearly say that it is the secrecy statute and the protections from that that underlie his protective order? What I believe it says, Your Honor, is that the concerns which led the Ohio legislature to conclude that this type of confidentiality was necessary informed his decision as to whether a protective order should issue. Even though his order says that your evidence of that is speculative and perhaps hyperbolic? Your Honor, again, Judge Frost did say that, but he also said that there was sufficient evidence presented. And he also, by the same token, he examined the other side of the scale. And he also said that the interests of the plaintiffs, they had not shown any real interest, compelling or any kind of substantial interest in needing this information. A good example is this. He dismissed out of hand the plaintiff's citation to their claims that they needed to know the identities of drug sources to see if they were complying with federal drug laws. That was completely, his dismissal out of hand was completely consistent with the law. This court held, in the Durer v. Strickland case, affirmed the dismissal of a prisoner's claim that Ohio was violating federal drug laws. Judge Frost held that there's no private right of action in those cases, and this court upheld that decision. But in his balancing of the burden, hasn't Judge Frost entered orders that say, in this situation, we understand the burden that occurs on the plaintiff because what it says is, in order to prove that this is cruel and inhuman punishment, I must provide this information to the court. And wasn't it Judge Frost who said, and that which is necessary to your claim is that which is withheld. Wasn't that his analysis? I would submit he did not say that, Your Honor. As a matter of fact, I think it's clear from his order that he recognized that the plaintiffs had really presented nothing, no convincing argument that knowing the identity of the state's drug sources was necessary to prove their claims. If he comes down to this, Your Honor, there's nothing in this order, if the district judge finds it appropriate, there's nothing in this order that prevents testing. Conceptually, testing could be done without revealing the identity of the source. The bottom line is that how in the world can you say that knowing the identity, the actual name of the manufacturer or supplier or distributor or compounder, factors in to a need to prove a violation of the Eighth Amendment. That is what the statute speculates. Your Honor, this is a prelude to filing suit against him under an anti-racketeering law. What about that? Your Honor, again, it is black letter law that the federal, the RICO statute, the private right of action is specifically limited to damages to business and property. There's no allegations of damage to business or property that's even conceivable here. This court has held that. In a fairly recent case, this court held that the RICO statute civil remedy has held to that. These prisoners do not fit within the zone of interest that that statute was designed to protect. It's even debatable. It's an open question whether you can even get injunctive relief under the civil RICO statute. This RICO claim is subject plainly to dismissal. In the RJR Nabisco case, the Supreme Court addressed in the context of another suit what the reach of the civil RICO statute is, and the court noted that it's limited to, it showed Congress intended to cabinet the damages to property and business and, most importantly, excluded personal injury. The RJR Nabisco case, the Supreme Court held that. What's your best case that we should follow in this particular case about the ruling of the district court? Is there a particular case? I would have to say this most compelling case is the Landrigan case. In that case, the district court issued a stay of execution because Arizona would not give specific drug information to a prisoner in the lawsuit. That was affirmed on appeal. The Supreme Court vacated that stay of execution saying that because it was totally speculative, it was the prisoner who was speculating, not what the importance of the identity was, they vacated the stay. Again, that's a compelling case because, in essence, the Supreme Court said, notwithstanding the issuance of a stay by a district judge, in essence, the Supreme Court said the state's interest in carrying out this execution was overwhelming and was determinative. That is a very powerful case. I think it does reflect many other cases. We cited in our brief where this is not an unusual circumstance. Many, many cases have issued protective orders for that very reason based on evidence that at least is not perhaps even as compelling as the evidence that was before the district court here. Those cases show that, by and large, the courts have balanced the interest in favor of the state and, most importantly, they recognize that this is not necessary to prove the prisoner's claims. If that's true in some cases where there are even some cases, Your Honors, where the states have not given any details on their execution protocol, here the defendants have given so much information in the way of, much was made of the recent use of three drugs, which was occasioned by the unavailability of other drugs which were used previously. Much is made of that. That was the execution protocol that was the subject of a four-day evidentiary hearing in 2009 in which Judge Frost then found met constitutional standards. Much has changed since then, but most of that has been additional safeguards put in place  Judge Norris, do you have any further questions? No, I do not, not of this group counsel, no. Thank you. Thank you very much, Your Honors, and we ask that the district court be affirmed. Then we'll have your rebuttal. Judge Stringsmead, I'll interrupt just for a moment. Judge Norris, can you hear me okay? I can. Lance has noticed, and I do believe this is correct, whenever we're speaking into any of our microphones, it is muting Judge Norris' system for some reason. So as long as we're quiet, we can hear him. But, like, I noticed when he asked a question before, if you started speaking over him, it cut him completely off. This has never happened. It must be the type of system they have there. Judge Norris, if you don't mind waving. Yeah, Judge Norris, the only way we are going to know is if you need a question, you're going to have to get our attention, and then everyone needs to be quiet to hear it. But if anybody starts to speak over you, it's going to cut you off. So there you go. The floor is yours, Judge Norris. Jane, if I could ask some questions that I would have asked before the rebuttal, and I'll have to, I hate to infringe on her rebuttal time. Have you asked the district court for an order permitting you to independently test these drugs that will be used on your clients? So in the past, I know we have. That was before Dennis McGuire's execution, because they were using new drugs there, there was an order. For these plaintiffs, you now are representing this case before. We haven't gotten to that point yet, Your Honor. We've just, you know, it's been just a little more than a month since the new protocol was issued, and so we filed amended complaints and TRO motions, and then we're about to do discovery. So I think very well, particularly because we believe that the testing that the defendants proposed is inadequate. Our reply brief had an example of spoiled milk. Why haven't you done this? I'm just puzzled if what you need this ID information for is so you'll know what's in the drugs, et cetera, et cetera. Why don't you just go do it? Get it tested. Sure. So I'm not sure that we won't ask for that at the appropriate time, but second, here's how the testing works. You can't just submit an unknown substance and say, test it and give us a green light on it. You have to know what you're looking for. So we certainly know we could ask for endotoxin and exotoxin testing, pH balance, things that could be problematic that the state's testing wouldn't account for. But as far as contaminants, I mean, it would be the universe of things that could be contaminants would have to be in the testing protocol, which is infeasible. Now, if we knew that the compounder or the manufacturer was also making some other substance that could be toxic, we could design a testing protocol to detect that substance. But the defendants refused to provide that kind of information under the evidence that could reasonably lead to the identification because they say, well, we could deduce who the compounders are if we know enough about their other activities. So at this point, we don't have the information necessary to design meaningful testing, although there is, as I said, definitely testing that could be accomplished, and I suspect we will be requesting that. Is that all? Yeah, it just sounds to me you're just buying into the space argument that all you want to do is stall. You don't really want to know what's in those drugs. You don't want to know if they're pure. You just want to stall. If you can, if you, if testing works, if you know the manufacturer's name, testing will work if you have the, if you have the substances, won't it? I apologize. I must not have communicated properly. It's not a stalling technique. If we had the information, the testing could be accomplished without any delay. With the protective order in place, we can't get the information we need to do complete meaningful testing. You don't have access to these drugs, correct? Oh, absolutely not. They're in the state's possession, right. So in order to do any of the testing, even with limited tests, you're going to have to petition either the state, unless the state agrees, or ask the court to order it. That's correct. And the testing we asked for before in McGuire would have been after the execution to test basically the residue that was left of the drug. You're right, Judge Strantz. That's an entire other jurisdictional and practical hurdle that we would have to overcome. Judge Norris, did you have another question? No. If that's the best you can do, that's fine. Thank you. For rebuttal, there's three main topics I'd like to address. One concerns Judge Feiler and Judge Norris' question about Philips and the other cases. I'd also like to talk about immunizing parties from suit and then generally the burden under Rule 26. So first, Philips was about a constitutional right to access information, and the majority rejected at least a component of that claim. Here we're talking about the right to discover relevant information. I mean, relevancy, as this court knows, is such a low bar compared to something that you're constitutionally entitled to. So that's why I say Philips doesn't decide whether this information should be disclosed in discovery. If you don't have standing in the Philips case, what do you have standing in? Is it just your state claims at this point? No, Your Honor. Your Honor, the standing, as I understand it, simply had to do with raising the First Amendment claim. And we don't have a First Amendment claim about this. I mean, that was challenging the statute itself. Here we're talking about a protective order going to the discovery of evidence relevant to our substantive claims attacking the state's execution. Your substantive claim is what, an Eighth Amendment issue? We have quite a few. We have Eighth Amendment equal protection claims. As I mentioned, the Ohio Corrupt Practices Claims, which, just to clarify, the restrictions counsel was talking about with federal RICO are irrelevant to the Ohio Corrupt Practices Act. So, you know, the lack of the business and property interest, that's different in Ohio. So none of those restrictions apply. What's your best case? Go ahead. No, you finish. What's your best case? I've asked your opponent what his best case was in order for you to get relief here. What's yours? Well, I'd actually like to point to some of his cases. In particular, he mentioned the Langergan case. All of the cases that the state is citing, saying that there's precedent for withholding this information, are not on point. Those cases were either vacating states of execution, which, again, was based on the lack of a constitutional right to this information, not the discovery right, or they involved cases where claims were being dismissed for other reasons, like a failure to state a claim, 12B6 reasons, or failure to allege a proper alternative. So nothing to do with the information. And then one of the cases they cite, which is the South Dakota case, Mueller v. Weber, they actually grant what we want here, restricted discovery. And it's not the only case that does that. We've cited Chester v. Beard. Recently in Florida, the case is one of the Wood v. Ryan cases. It's actually captioned First Amendment Coalition. This was just at the end of October. The case number there is 16-MC-25. Restricted discovery was granted. So those are just in the lethal injection context. The Coons v. Allentown case that we cited in our brief from Pennsylvania involved abortion clinics with much more substantial harm being alleged on a controversial issue. And in that case, the court decided most of the information should be publicly disclosed, but some sensitive information about patients' confidentiality or security things could be disclosed attorney's eyes only. And that's what we want here. And that relates to Council talked about the Oklahoma email that the FBI rejected as any credible threat. And that the state's own expert said, even with that evidence, all of the concerns would be allayed by attorney's eyes only disclosure. There's just simply no evidence at all to justify denying that kind of limited disclosure. So where we are, we are in a federal case with two sets of litigants, and we are under Rule 26C of the Federal Rules of Civil Procedure. And our question is, has the state established and carried its burden of proof as required by Rule 26 in order to obtain this protective order? Your position is they have not. They have not. And look at Council's own words. He said, oh, there may be problems. Or he said, I wrote down what he said, I think it could very well be that if they went to the supplier and said, oh, we need you to do a declaration, it would scare them off. That alone tells you that it's speculative. It's generalized. It's not sufficient under Rule 26. And as far as the idea of immunizing a party from suit, we're not aware of any authority that allows that. The Council mentioned, I think he was referring to the Zink versus Lombardi case, but INDICTA kind of mentioned that. But I haven't found a single case that says, yes, it's legitimate to basically use a motion for a protective order as a dispositive motion in disguise, because that's what happens when you allow a party to immunize from suit the claim that gets dismissed because we can't prosecute it. So that's not a proper use for a protective order. And finally, as far as just generally balancing things under Rule 26, a lot of what Council said is not appropriate to consider here like the botches. It absolutely is, because it's a balancing test, and our need to get this information is informed by the reality that Ohio and many other states have a long history of botched executions. I refer the Court to Justice French on the Ohio Supreme Court's dissent in Broome earlier this year, where she lays out Ohio's history. That's at 51 NE 3D 620. And going back to the burden, to say that it's clear Ohio can't get these drugs, but Ohio has to prove it. Other states are getting drugs. Georgia executed someone this week. Texas is executing people. Florida was before they stopped because of Hearst issues. So executions are being carried on by other states, and there's just zero proof that the state can't get the drugs like other states are able to get it. Do those other states have the same drug protocol that Ohio has? Ohio has three protocols now, and so, yes, some states have. I'm talking about the ones in effect now. So Florida, I believe, has the same three-drug protocol, and I believe Texas has the penobarbital, I think, but I don't want to say for sure about those facts. So, yes, the same protocols that Ohio has are being represented in different states that are executing and are getting these drugs to do. You don't know whether there's a civil case in those places similar to yours, right? I'm sorry? You don't know that there's a case in those states similar to this one against the state of Ohio? I guess what you mean, similar. I mean, yes, there's lethal injection litigation. Oh, I mean attacking the drug manufacturers. Oh, on the Civil Rico claims? That's Civil Rico or any of these other claims in Texas or Florida. I'm not aware. I'm trying to make myself clear, but that's what I'm talking about, a parallel case. I don't know. I think it's kind of a newer claim, and I think it may have been brought other places, but it hasn't been litigated to conclusion. And I'd also like to point out that- Do all of those states have the same sort of secrecy law?  I mean, some- It would be a completely different scenario, wouldn't it? Correct. Some states have statutes. Some of these claims are being litigated in state court where a state privilege would apply, unlike in federal court. Some states have simply sort of expanded their definition of execution team members to include the compounders. So there are a lot of different variations there. So at the beginning, I said there were three bases for the district court's order. The first would be the threat. We've already discussed that's completely taken care of by attorneys' eyes only. The second would be suit. We've talked about how that's not a legitimate reason. And then finally, that the state can't carry out executions. And as we've discussed, there's no evidence of that. And I'd just like to conclude by saying we know executions are constitutional. We're not disputing that here. But as Judge Frost said in the Smith decision, he said that it's wholly lawful to execute capital inmates, but it's wholly unlawful to even attempt to do so in a manner that violates the Constitution. And that's what the claims that the plaintiffs have here that are legitimate claims that have not been dismissed out of the lawsuit are attempting to do. The right to this information is so clear in civil discovery, and the only way to not give us the information is for the state to meet their burden under Rule 26, and they simply haven't done that. So for these reasons, we ask that the court vacate the protective order or, at a minimum, remand with instructions that attorneys' eyes only discovery be provided so that the interest can be properly balanced in this case. Thank you. Thank you. You're welcome. Both of you, we appreciate your argument and your work, your written documents. We will take this under advisement and try to move quickly because we understand that there is a short order here.